IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| MICHAEL E. TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | CV-03-1311-ST |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | |
| WEST OREGON ELECTRIC COOPERATIVE, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Michael E. Taylor ("Taylor"), brings this lawsuit alleging, in essence, that he was wrongfully terminated by defendant, West Oregon Electric Cooperative, Inc. ("WOEC"), because of age and disabilities.

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Before the court is WOEC's motion for summary judgment (docket # 36). For the reasons that follow, that motion is granted as to the disability discrimination claim and denied as to the age discrimination claim.

**STANDARD**

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id* at 324. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630-31. However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*, 818 F2d 1466, 1470 (9th Cir 1987), *cert denied*, 484 US 1006 (1988).

The Ninth Circuit has set a high standard for granting summary judgment in employment discrimination cases. "[W]e require very little evidence to survive summary judgment in a

discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the fact-finder, upon a full record." *Schnidrig v. Columbia Machine, Inc.*, 80 F3d 1406, 1410 (9th Cir 1996) (citations omitted); *see also Lam v. Univ. of Ha.*, 40 FRD 1551, 1563 (9th Cir 1994).

## BACKGROUND

WOEC is a private, member-owned cooperative electric utility providing electric distribution service in Northwest Oregon which employs 10 linemen and two foremen.

Taylor began work with WOEC in 1977 as a journeyman lineman. After two years, he was promoted to foreman, a position he held for almost 20 years. Taylor began to have difficulties in 1998, coinciding with the hiring of Russell Green ("Green") as General Manager and Steven Hursh ("Hursh") as Engineer. At that time, Taylor was about age 55, Green was about age 40, and Hursh was in his mid 40's. Taylor claims that Hursh lacked experience and relied heavily on input from Tim Titus ("Titus"), a substantially younger employee who was the Union steward and who allegedly made false statements about Taylor to management.

The chronology of Taylor's difficulties with management is as follows:

On December 8, 1999, Green issued a written reprimand to Taylor for poor work productivity, disruptive behavior and insubordination. Taylor disputes the validity of these charges, stating that the alleged misdeeds were largely the work of others, and that the reprimand was improper because some of the events happened 10 months previously.

Taylor was off work from January 19 through February 2, 2000, for carpal tunnel surgery. Taylor contends that shortly thereafter, Green, Titus, and Hursh conspired to get him fired. On March 22, 2000, Hursh wrote a memorandum to Taylor. WOEC argues that the

memorandum is a reprimand for failing to fill out timecards, returning from the job site early to read the newspaper, failing to fill out a job briefing report, and failing to fill out an interruption report after an incident that cut power to 85 customers. To the contrary, Taylor notes that the memorandum is a response to his December 15, 1999 letter and better characterized as a clarification of company tree-cutting procedures, rather than a progressive discipline measure.

In May of 2000, Taylor came to believe that management was unfairly scrutinizing his job briefing ("tailgate") reports. Taylor states that Titus purposely avoided signing Taylor's tailgate reports, with the intention of creating trouble for Taylor and in furtherance of the conspiracy to get Taylor fired.

On August 22, 2000, Taylor reported a safety concern about a crew working in a "hot" area.

The next day, Taylor teased Greg Schaumberg ("Schaumberg"), pretending a rag that Schaumberg used to wipe his face was contaminated with poison oak. Schaumberg resented the teasing. There was some discussion of the incident within management. WOEC contends that this incident exemplifies the problems with Taylor's leadership style. Taylor contends that horseplay of this sort is common at WOEC and that Schaumberg overreacted.

Taylor claims that on September 1, 2000, Hursh and Green met to discuss their plan to get rid of Taylor. The log from Taylor's employment file includes an entry on this date, details some of the personality difficulties going on amongst the crews, and characterizes Taylor's behavior as a "roller coaster." Taylor Ex 5, p. 2.

On September 19, 2000, Hursh sent Taylor a performance review memorandum that was critical of Taylor's "moral/teambuilding" skills as exemplified by the teasing of Schaumberg and

ongoing conflict as a result. The memorandum also criticized Taylor for improper tailboard sessions:

> [y]ou agreed to do a better job on tailboard meetings in the future, but frankly I'm not convinced that your performance in this area will improve . . . no progress has been made in the areas of morale/teambuilding and providing adequate job briefings as identified in my memorandum dated March 22, 2000. As a result, I am referring this issue to [Green] for review and consideration of disciplinary action.

Taylor Ex 7, p. 2.

Taylor contends that these criticisms are contrived, pretextual, and part of an unfurling plan to manufacture evidence against him. Taylor also contends that management's handling of these issues was contrary to the policy set forth in the collective bargaining agreement.

In the course of the subsequent review, after conferring with IBEW Local 125 Business Manager Bill Miller, Green suspended Taylor's employment for five days. Upon his return on October 9, 2000, Taylor was given another memorandum describing WOEC's expectations, including better communications, better work ethic, respect for fellow employees, and training to improve skills as a supervisior. The memorandum also contained a new requirement that Taylor debrief Hursh at the end of each day.

In November of 2000, Taylor reported four safety issues to WOEC. On November 21, the younger foreman neglected to conduct a tailboard session but received no reprimand.

On December 20, 2000, Green reprimanded Taylor for stopping at the Elderberry Inn during the course of making a delivery. WOEC contends that this illustrates Taylor's practice of taking excessive breaks.

On January 30 or 31 of 2001, Taylor reported a safety concern with Truck # 47, which he claims upset Hursh.

On April 6, 2001, Taylor notified Hursh of a safety problem with another truck.

On April 17, 2001, Hursh told Taylor his crew took too long on a job.

On May 2, 2001, Green demoted Taylor to lineman, ostensibly for failing to conduct end-of-the-day meetings with management. Taylor states the this reason was pretexual, that management had de-prioritized the meetings, then, unbeknownst to Taylor, began documenting Taylor's failure to initiate the meetings to create a reason for his demotion. Taylor states that this discipline does not comport with the procedure set forth in the collective bargaining agreement. As part of the demotion, Taylor was put on a one-year probation period, which specified, among other things, that his employment with WOEC was "dependant upon . . . total dedication and cooperation as a member of the line crew." Taylor Ex 10, p. 2. The memorandum advised Taylor to "[c]onsider this memo your final chance to continue as an employee of West Oregon."

After his demotion, Taylor reported to foremen Gunny Cox ("Cox") and Jim King. During the second half of that year, Taylor worked primarily under the supervision of Cox. On April 25, 2002, Hursh and Green met with Cox to decide whether Taylor had been meeting the conditions of his probation. They decided that he had not done so and was still being unproductive, defiant and unsafe, did not follow directions or safe practices and would avoid work. None of these problems, however, had been documented during the year after Taylor's demotion.

On April 26, 2002, Green terminated Taylor's employment. Taylor contends that his termination came without warning, and that he had been presented with no criticism, written or otherwise, since the demotion. At that time, Taylor was age 58. Of the other nine linemen, all but one were over 40 years old. Two were in their 60's and Cox was age 54.

## DISCUSSION

Taylor's Complaint alleges three claims: (1) age discrimination[1] (First Cause of Action); (2) violation of the American with Disabilities Act, 42 USC §§ 12101-12213 ("ADA") (Second Cause of Action); and violation of 42 USC § 1983 (Third Cause of Action). Because Taylor has voluntarily withdrawn his § 1983 claim, acknowledging that WOEC is not a state actor, this court addresses only the remaining two claims.

1.      **Age Discrimination (First Cause of Action)**

The Age Discrimination Employment Act, 42 USC § 621, *et seq* ("ADEA"), makes it unlawful for an employer to hire or discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's age. 29 USC § 623. Protection extends to all individuals who are at least 40 years old. A plaintiff must show that his age "actually played a role in [the decision making ] process and had a determinative influence on the outcome." *Pottenger v. Potlach Corp.*, 329 F3d 740, 745 (9th Cir 2003).

The Ninth Circuit analyzes ADEA cases using the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973). *See Reeves v. Sanderson Plumbing Prods, Inc.*,

---

[1] Although the Complaint alleges age discrimination in violation of Title VII, 42 USC § 2000e *et seq*, that reference appears to be in error. Instead, age discrimination in employment violates the Age Discrimination in Employment Act, 29 USC § 621, *et seq*.

530 US 133, 141-42 (2000) (collecting cases from other circuits); *Nidds v. Schindler Elevator Corp.*, 113 F3d 912, 917 (9th Cir 1996), *cert denied*, 522 US 950 (1997). Under the three-part methodology articulated in *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of discrimination. The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff is then afforded an opportunity to demonstrate that the employer's proffered reason was pretextual, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 US 248, 256 (1981).

A. *Prima Facie* **Case**

The requisite degree of proof necessary to establish a *prima facie* case of discrimination on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 889 (9th Cir 1994). The "burden of establishing a *prima facie* case is not designed to be 'onerous' and only requires the production of evidence which 'suggests' that the employment decision was based on age." *Rose v. Wells Fargo & Co.*, 902 F2d 1417, 1420 n1 (9th Cir 1990), quoting *Diaz v. Am. Tel. & Tel.*, 752 F2d 1356, 1361 (9th Cir 1985). Generally, an employment discrimination plaintiff needs to "produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by a factfinder, upon a full record.'" *Chuang v. Univ. of Cal. Davis*, 225 F3d 1115, 1124 (9th Cir 2000), quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir), *cert denied*, 519 US 927 (1996).

Generally, to establish a *prima facie* case of an ADEA violation, the plaintiff must show he (1) belonged to a protected class; (2) was satisfactorily performing his job or was qualified for hire or promotion; (3) was terminated, rejected for employment, or otherwise subjected to an adverse employment action; and (4) was replaced by a substantially younger employee with equal or inferior qualifications. *Wallis v. J.R. Simplot Co.,* 26 F3d 885, 891 (9th Cir 1994). Proof of replacement is not always required, however, if the discharge results from a reduction in workforce and the plaintiff presents circumstantial evidence giving rise to an inference of age discrimination. *Id.* Such an inference can be established by showing the employer had a continuing need for the plaintiff's skills and services and that a plaintiff's various duties were still being performed. *Id.*

Here, Taylor easily satisfies the first and third prongs of his *prima facie* case. On April 26, 2002, the date on which he was terminated, Taylor was 58 years old. Therefore, he belongs to the protected class. He also suffered an adverse employment action in the form of his termination.

The record is unclear as to whether Taylor satisfies the fourth prong of the *prima facie* case (that he must be replaced by a substantially younger employee with equal or inferior qualifications). After Taylor's termination, WOEC hired three other linemen who were 46, 57, and 61 years old. Thus, it does not appear that Taylor lost his job due to a reduction in force which would excuse the "proof of replacement" requirement. If the first lineman hired after Taylor's termination was older or about the same age as Taylor, then Taylor was not replaced by a younger employee, casting doubt on whether he can satisfy his *prima facie* case. However, WOEC has not provided this court with the dates of hire of the new linemen. Since one of the

three new linemen was substantially younger than Taylor, this court will give Taylor the benefit of the doubt and assume that Taylor was replaced by a younger employee.

With respect to the second prong of his *prima facie* case, the parties dispute whether Taylor was satisfactorily performing his job, which is a more difficult question. Although WOEC, of course, alleges that he was not, Taylor has submitted evidence that he was satisfactorily performing his job. Additionally, the Ninth Circuit has cautioned that subjective evidence of an employee's performance is best considered outside the context of the *prima facie* case:

> In our view, objective job qualifications are best treated at step one and subjective criteria, along with any supporting evidence, are best treated at the later stages of the process. To do otherwise would in many instances collapse the three step analysis into a single step at which all issues would be resolved. This would defeat the purpose underlying the *McDonnell Douglas* process. In addition, addressing the [subjective criteria] at the first step of the analysis would increase the possibility that courts will be required to engage in evaluations of the performance of [employees], a task to which others are better suited.

*Lynn v. Regents of Univ. of Cal.*, 656 F2d 1337, 1344-45 (9th Cir 1981), *cert denied*, 459 US 823 (1982) (citation and footnote omitted).

Thus, Taylor satisfies his *prima facie* case.

### B. <u>Legitimate Non-discriminatory Reason</u>

The burden of production then shifts to WOEC to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Reeves*, 530 US at 142. WOEC has submitted evidence that Taylor's termination was based on his unwillingness to modify his behavior as it related to issues of work performance, safety, team building of morale and insubordination toward supervisors. Facially, these reasons are both legitimate and

nondiscriminatory. Thus, WOEC has met its burden of production. Having done so, the presumption of unlawful discrimination that arose with the *prima facie* case "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 US 502, 511 (1993).

    C.    <u>**Pretext**</u>

To avoid summary judgment, Taylor must show that based on all the evidence, a rational trier of fact could find that WOEC's explanation is pretextual and, therefore, that it fired Taylor for an impermissibly discriminatory reason. *Wallis*, 26 F3d at 889. If Taylor meets this burden, then WOEC's motion for summary judgment must be denied.

Taylor's affidavit sets forth a narrative which generally describes a politicized work place, where a rift developed between younger employees and those with greater seniority. Taylor states that his "troubles began in 1998" with the arrival of Green and Hursh. The new younger management was misled by younger employees who disparaged Taylor's job performance, hoping to gain from his misfortune by taking over his position. Taylor recounts the episodes proffered by WOEC as evidence of poor performance, offers competing versions of those events, and asserts that this was pretextual:

> [W]henever I tried to provide positive input to Mr. Hursh about safety issues or any issues at all that I viewed as for the good of the cause, I would get a memo . . . in return . . . they [intended] to get rid of me no matter what I did.

Taylor Dec, ¶ 19.

Taylor contends that WOEC dealt with him in this way because he represented "the old guard" at WOEC, whom management unfairly resented.

Taylor's co-worker, Phyllis Krieger ("Krieger"), states that, on repeated occasions, management responded to safety concerns brought by Taylor with baseless reprimands. As

11 - OPINION AND ORDER

foreman, Taylor was conscientious about safety protocol, more so than other foremen. Krieger states that the horseplay for which Taylor was reprimanded was common at WOEC and that younger workers who behaved similarly were not reprimanded.

Lee DuVall ("DuVall"), a former WOEC superintendent, states that, in the 1990's, the management at WOEC initiated new hiring practices, emphasizing "book intelligence" over practical experience. Allegedly, the new management resented experienced workers like Taylor because their expertise served to highlight management's lack of expertise. He felt that the younger employees such as Schaumberg were never disciplined, unlike Taylor. DuVall also states that management resented Taylor because of his previous role as Union steward, a position which required Taylor to raise concerns that management resented. DuVall voluntarily terminated his employment because of the lack of practical experience within management and the safety problems that this created.

The testimony of Taylor, Krieger, and DuVall is sufficient for Taylor to avoid summary judgment on his age discrimination claim. Together they contradict the reasons that WOEC asserts for firing Taylor. WOEC states that Taylor was fired because of an unwillingness to modify his behavior as it related to issues of work performance, safety, team building of morale and insubordination toward supervisors. To the contrary, Taylor's own testimony calls into question all the facts underlying WOEC's stated reasons for termination, and Krieger and DuVall support Taylor's contention that he was one of the safer workers at the company, that management resented him voicing safety concerns, and that Hursh appeared to resent him because of his know-how.

In addition, the complete absence of documentation of the deficiencies in Taylor's work performance for one year after his demotion is problematic because the reasons offerd by WOEC lack specificity. From the record, it appears that Taylor's termination was based in part on the same rationale and events underlying his demotion. Yet the two jobs as foreman and lineman were different with distinct duties. This confusion, when paired with the lack of documentation from the post-demotion period, provides an adequate basis to reasonably infer that Taylor's termination was pretextual.

In sum, Taylor has provided enough facts for a rational person to conclude that WOEC's reasons for firing him were pretextual. Whether age discrimination was a motivating factor underlying the alleged pretext must be decided by the trier-of-fact, not this court:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination . . . no additional proof of discrimination is *required*.

*St. Mary's*, 509 US at 511 (emphasis in original)(internal citations omitted).

This minimal evidentiary burden serves an important purpose and reflects the fact that discrimination cases are difficult to prove:

> All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult. The prohibitions against discrimination . . . reflect an important national policy. There will seldom be "eyewitness" testimony as to the employer's mental processes . . . [yet the] law often obliges finders of fact to inquire into a person's state of mind.

*United Postal Serv. Bd. of Governors v. Aikens*, 460 US 709, 716 (1983).

Admittedly, the evidence tends to suggest that Taylor's termination was motivated not necessarily by age, but rather by management's resentment of Taylor for the way he embodied "old guard" attitudes. At trial, Taylor will have to prove that age motivated the termination, not merely some other factor correlated with age. The distinction between termination based on age, and termination based on some other motivating factor correlated with age, was elucidated in *Hazen Paper Co. v. Biggins*, 507 US 604 (1993). In that case, the plaintiff was fired a few weeks before reaching the 10-year vesting level in the pension plan. The termination violated ERISA, but the Supreme Court held that it did not violate the ADEA, stating:

> We now clarify that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age . . . Whatever the employer's decision making process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.

*Id* at 609-10.

"It is the essence of old age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." *Id* at 610. Nevertheless, when "the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age . . . ." *Id* at 611.

Accordingly, to prevail on this claim, Taylor will have to convince the jury that management resented him not only for his "old guard" attitudes, but specifically because of his age. The conclusion that Taylor's termination was motivated by workplace politics, personality conflicts, or union politics will not suffice.

**II.**     **ADA Claim (Second Cause of Action)**

14 - OPINION AND ORDER

Taylor alleges that in addition to his age, his disability due to his back problems[2] was a motivating factor in WOEC's decision to fire him.

As an initial matter, WOEC argues that Taylor's ADA claim is barred by his failure to exhaust administrative remedies because he did not specify disability as the cause of termination in his administrative complaint to Oregon's Bureau of Labor and Industries ("BOLI"). Taylor's BOLI complaint alleges "unlawful employment discrimination on the basis of age (58)" and contains no reference to disability. WOEC cites cases from other circuits as authority for the notion that Taylor's failure to specify disability, rather than age, amounts to a failure to exhaust. This court need not decide this issue because Taylor cannot show that his back problems constitute a disability under the ADA, nor can he show any link between his termination and his back problems..

To be disabled under the ADA, plaintiff must prove that his disabilities substantially impaired a major life activity. 42 USC § 12102(2); *Raytheon Co. v. Hernandez*, 540 US 44, 49 (2003). Federal regulations describe major life activities as including functions "such as caring for oneself, walking, seeing, hearing, speaking, breathing, learning, and working." 45 CFR § 84.3(j)(2)(ii); 29 CFR § 1630.2(I). This illustrative list of major life activities requires the activity to be of "comparative importance" and "central to the life process itself." *Bragdon v. Abbott*, 524 US 624, 638 (1998).

Here, Taylor fails to put forth sufficient evidence as to whether his back problems rise to this level. The only evidence that Taylor offers is the following conclusory statement:

---

[2] Some of Taylor's submissions suggest that his carpel tunnel syndrom may also be involved in this allegation, but, at oral argument, Taylor's attorney clarified that his ADA claim is based solely on his back problems.

> My disabilities consist of both a bad back and carpal tunnel syndrome for which I have an accepted claim.[3] These two disabilities affect many major life activities such as gardening, fishing, eating, working and all forms of regular life experiences. Moreover, the employees at WOEC assumed that I was slacking off when I would have take [sic] a moment to loosen up my stiff back or work with my disability in working with tools because of my carpal tunnel syndrome.

Taylor Dec, ¶ 34.

Yet, at his deposition, Taylor testified that while he occasionally took brief rests due to back pain, it did not interfere with his ability to do work. This statement precludes Taylor from establishing disability in the major life activity of working.

Nor can Taylor's ADA claim survive based on the other major life activities he lists. While the court can certainly appreciate that gardening and fishing are cherished pastimes, without any guiding case law, the court is unwilling to conclude that these are "major life activities." Moreover, although eating has been established as a major life activity in the Ninth Circuit, *Fraser v. Goodale*, 342 F3d 1032 (9th Cir 2003), Taylor must set forth more than the bald assertion that he was impaired in eating. Unlike *Fraser*, where the court was presented with evidence of plaintiff's diabetes and details about how the related symptoms affected her life, this court has no substantive information about Taylor's difficulties with eating due to back pain.

Finally, even if Taylor established an impairment in a major life activity, Taylor testified in his deposition that he suffered no adverse treatment from WOEC because of any disability he may have had. In light of this testimony, Taylor cannot establish the causal link critical to prevailing on an ADA claim.

---

[3] The "accepted claim" to which Taylor refers is a workers' compensation award of temporary disability payment for the period of May 5, 1992, through June 14, 1993.

## **ORDER**

For these reasons, WOEC's motion for summary judgment (docket #36) is GRANTED as to the Second Cause of Action for violation of the ADA and DENIED as to the First Cause of Action for age discrimination.

DATED this 5th day of May, 2005.

       /s/  Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge